JEFF SILVESTRI, ESQ.
Nevada Bar No. 5779
McDONALD CARANO WILSON LLP
2300 W. Sahara Avenue, Suite 1200
Las Vegas, NV  89102
Telephone:  702.873.4100
Facsimile:    702.873.9966
E-mail:  jsilvestri@mcdonaldcarano.com

ROBERT B. BODZIN, ESQ. (*pro hac vice to be submitted*)
KLEINBARD BELL & BRECKER LLP
One Liberty Place, 46th Floor
1650 Market Street
Philadelphia, PA  19103
Telephone:  215.568.2000
E-mail:  rbodzin@kleinbard.com

JOHN FRAZIER HUNT, ESQ. (*pro hac vice to be submitted*)
HUNT & AYRES
1818 Market Street, 33rd Floor
Philadelphia, PA  19103
Telephone:  215.557.8500
E-mail:  jfhunt@huntandayres.com

*Attorneys for Plaintiffs Preferred Management Partners, Inc., FLOORiT Financial LLC, and DRIVEiT Consumer Credit, LLC*

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEVADA**

| | |
|---|---|
| PREFERRED MANAGEMENT PARTNERS, INC., a Nevada corporation; FLOORiT FINANCIAL LLC, a Nevada limited liability company; and DRIVEiT CONSUMER CREDIT, LLC, a Delaware limited liability company,<br><br>Plaintiffs,<br><br>v.<br><br>BRANDON OGDEN; TAYLOR OGDEN; MY CAR AGENT, a California corporation; and DRIVEiT FINANCIAL SERVICES, LLC, a California limited liability company, formerly known as "MCA Finance, LLC",<br><br>Defendants. | CASE NO. _____<br><br>**COMPLAINT**<br><br>**Jury Trial Demanded** |

**Parties**

1. Plaintiff, Preferred Management Partners, Inc. ("PMP") is a corporation organized and existing under the laws of the State of Nevada with its principal place of business located at 1453 Villa Rica Drive, Henderson, Nevada 89052.

2. Plaintiff, FLOORiT Financial LLC ("FLOORiT") is a Nevada limited liability company with its principal place of business located at 170 South Virginia Street, Reno, Nevada 89501.

3. Plaintiff, DRIVEiT Consumer Credit, LLC ("DCC") is a Delaware limited liability company with its principal place of business located at 1453 Villa Rica Drive, Henderson, Nevada 89052.

4. Defendant, Brandon Ogden ("Ogden") is an adult individual and citizen of the State of California residing at 1962 Port Cardiff Place, Newport Beach, California 92560.

5. Defendant, Taylor Ogden is an adult individual and citizen of the State of California residing at 4946 E. Sycamore Avenue, Orange, California 92869.

6. Defendant, My Car Agent ("MCA") is a corporation organized and existing under the laws of the State of California with its principal place of business located at 910 E. Whittier Blvd., La Habra, California 90631.

7. Defendant, DRIVEiT Financial Services, LLC ("DFS"), formerly known as MCA Finance, LLC ("MCAF") is a California limited liability company with its principal place of business located at 2475 N. Tustin Street, Orange, California 92867.

**Jurisdiction and Venue**

8. This Court has diversity jurisdiction pursuant to 28 U.S.C. §1332 as there is complete diversity of citizenship between the parties and the amount in controversy is in excess of $75,000, exclusive of interest and costs.

9. Venue is proper in this district pursuant to 28 U.S.C. §1391 because a substantial part of the events and omissions giving rise to the claims occurred in this district.

. . .

. . .

**Background**

10. Ogden has been in the business of buying, selling and financing used consumer motor vehicles for over a decade.

11. In or about June of 2011, Ogden approached PMP and its principal, Preston Smart ("Smart") seeking additional capital to expand his business of selling and financing used motor vehicles.

12. Ogden touted his experience and skill in purchasing and selling used consumer vehicles and providing the necessary financing for the used vehicle dealer and ultimate consumer.

**The Ogden Entities**

13. Prior to June of 2011, Ogden purchased and sold used vehicles through MCA, a California corporation formed in 2002 of which Ogden was the 100% owner.

14. Prior to June of 2011, Ogden principally provided financing for used vehicles purchased through MCA via MCAF, a California limited liability company of which Ogden was the 100% owner. A copy of the MCAF Operating Agreement and Amendments thereto (collectively the "Operating Agreement") is attached hereto and designated **Exhibit "A"**.

15. Prior to November 2011, Ogden was the President and Chief Operating Officer of MCA and sole member of MCAF.

16. At all times relevant to the transactions described herein, Ogden remained as the President and Chief Operating Officer of MCA and the principal manager of MCAF.

**The Initial Investment**

17. Beginning in or about June of 2011, PMP, at the request of Ogden, began making loans to MCAF to assist MCAF in the operation of its vehicle financing business. The loans were made pursuant to a Revolving Line of Credit Promissory Note ("MCAF Note") dated June 15, 2011, a copy of which is attached hereto and designated **Exhibit "B"**.

18. Between June of 2011 and November 4, 2011 PMP advanced at least $1,400,000 to MCAF pursuant to the MCAF Note and amendments thereto.

19. On or about November 4, 2011, PMP, MCA and Ogden entered into a Stock Purchase and Sale Agreement-Issuer ("MCA Investment Agreement") for the sale by MCA of 30% of its stock to PMP, a copy of which is attached hereto and designated **Exhibit "C"**.

20. The consideration for the 30% interest in MCA was PMP's agreement to provide MCAF with a credit facility for $1,500,000.00 pursuant to a Revolving Line of Credit Promissory Note dated November 4, 2011 ("Promissory Note"), a copy of which is attached hereto and designated **Exhibit "D"**.

21. On or about November 4, 2011, Ogden agreed to sell PMP a 70% interest in MCAF for the sum of $1,400,000.00 in cash. The terms of the investment are described in a November 4, 2011 Agreement to Amend the Operating Agreement ("MCAF Investment Agreement") by and between Ogden and PMP, a copy of which is attached hereto and designated **Exhibit "E"**.

22. The MCAF Investment Agreement also granted Ogden an option to purchase additional membership interests in MCAF within 30 months to enable Ogden to acquire up to 49% of the membership interests of MCAF at the same price paid by PMP for a total of $380,000.00.

### The Fraud Scheme

23. Once Ogden obtained a reliable and consistent source of funding from PMP he embarked upon a scheme designed to induce PMP to provide significant additional funding and investment in MCAF for Ogden's own personal benefit and gain directly or through MCA.

24. First, Ogden directed that MCA provide MCAF and, in turn, PMP false information about the value of vehicles purchased and resold by MCA.

25. Ogden inflated the values by listing options that were not present in the vehicles purchased by MCA to maximize the sums financed by MCAF.

26. Next, Ogden caused vehicles sold by MCA to be financed by MCAF knowing that the loans did not satisfy the underwriting standards of MCA, MCAF and/or the used vehicle financing industry in California.

27. Next, Ogden caused the books and records of MCAF to inflate the assets and deflate the liabilities of MCAF by failing to account for and recognize losses, bad debts and uncollectible debts.

28. Next, Ogden caused substantial funds to be advanced from MCAF to MCA and later from FLOORiT to MCA to prop up a failing business enterprise while intentionally disguising or distorting the true financial picture of MCA to the plaintiffs.

29. Next, Ogden induced PMP to advance additional funds to MCAF, MCA or FLOORiT to expand into collateral businesses associated with used consumer vehicles such as refurbishing and detailing used vehicles, wholesaling reconditioned vehicles, insuring vehicles, flooring financing and packaging and selling used consumer vehicle loans while relying on the financial soundness and integrity of MCAF and MCA.

**The Additional Investments**

30. Between June of 2011 and June of 2012 MCAF borrowed at least $7,900,000.00 from PMP for the claimed purpose of facilitating additional consumer loans.

31. In early 2012 Ogden sought additional investments and financing from PMP for the claimed purpose of facilitating the purchase of additional vehicles by MCA.

32. On or about February 3, 2012, PMP and Ogden formed FLOORiT, a Nevada limited liability company.

33. PMP had an 80% membership interest and Ogden had a 20% membership interest in FLOORiT.

34. On or about March 26, 2012, FLOORiT and MCA entered into a Flooring Agreement whereby FLOORiT provided financing to MCA for the acquisition of vehicles, a copy of which is attached hereto and designated **Exhibit "F"**.

35. The Flooring Agreement was personally guaranteed by Taylor Ogden, brother of Brandon Ogden and an employee of MCA.

36. On or about May 23, 2013, FLOORiT returned Ogden's initial $10,000.00 investment in the company and Ogden's 20% membership interest was rescinded.

37. On or about June 30, 2012, MCAF executed promissory notes in favor of PMP in the amount of $1,500,000.00, $1,400,000.00 and $5,000,000.00 (collectively "PMP Notes") with principal and interest due on June 30, 2017 "or written notice", copies of which are attached hereto and designated **Exhibits "G", "H" and "I"**.

5

38. The PMP Notes aggregated the various sums at varying interest rates loaned by PMP to MCAF from June, 2011 through June, 2012.

39. On or about June 30, 2012, MCAF executed a promissory note in favor of Ogden in the amount of $980,000 ("Ogden Note"), a copy of which is attached hereto and designated **Exhibit "J"**.

40. The Ogden Note evidenced the various advances, contributions or loans made to MCAF by Ogden through June 30, 2012, including Ogden's exercise of the option to acquire an additional 19% of MCAF.

41. The PMP Notes and Ogden Note evidence approximately the aggregate various investments made by PMP and Ogden in MCAF.

42. In 2012, PMP and Ogden agreed to restructure the various corporate entities in order to raise additional capital and to obtain additional lines of credit from other financial institutions and to expand business operations.

43. During 2012 and the first half of 2013 PMP and Ogden made several unsuccessful attempts to raise additional capital or lines of credit from third parties or financial institutions.

44. In or about February 2013 MCAF changed its name to DRIVEiT Financial Services, LLC ("DFS").

## The Scheme Collapses

45. After several failed attempts by DFS to obtain a line of credit from a bank or banks, MCAF turned to the secondary markets seeking from qualified venture capital funds, private equity funds or hedge funds a line of credit.

46. In or about May 2013 DFS found a new lender to provide a credit facility which would provide adequate cash flow to keep DFS afloat.

47. The new lender would only consider lending to DFS if it assigned its best qualified and best performing consumer loans as collateral to a newly created special purpose vehicle. In other words, PMP – and to a much lesser extent, Ogden – needed to surrender the most valuable collateral supporting the PMP Notes and Ogden Note to keep DFS and indirectly MCA afloat.

48. On or about July 13, 2013, PMP and Ogden formed DRIVEiT Consumer Credit, LLC ("DCC") to hold the prime consumer loans from DFS that would be collateral for the new lender.

49. On or about September 30, 2013, DFS, PMP, Ogden and DCC entered into a series of Agreements, including <u>inter</u> <u>alia</u> a Distribution Agreement, Contribution Agreement and Debt Modification Agreement, copies of which are attached hereto and designated **Exhibits "K", "L" and "M."**

50. Pursuant to the Contribution Agreement and Debt Modification Agreement, PMP and Ogden agreed to contribute certain assets consisting of selected consumer vehicle loans and their respective portions of the PMP Notes and Ogden Note as capital contributions to DCC at a ratio of 90% by PMP and 10% by Ogden in the total amount of $5,500,000.00 (the "Transferred Notes").

51. Pursuant to the terms of the Contribution Agreement and Debt Modification Agreement, PMP and Ogden agreed that the dates principal and interest would be paid on the Transferred Notes was extended for a period of 5 years until August 1, 2018.

52. By the terms of the Loan Agreement between DCC and Keystone National Group, LLC ("Keystone"), the agent for the lenders, and the Intercreditor and Subordination Agreement, the transferred Notes were subordinated to the senior position of the lenders.

53. As a result of the DCC transaction, $4,950,000.00 of the PMP Notes and $550,000.00 of the Ogden Note were contributed to DCC and were consequently subordinated to senior priority of Keystone.

54. On or about October 31, 2013, Ogden resigned from his positions with DFS.

55. On November 11, 2013, Ogden made a repayment demand on DFS, a copy of which is attached thereto and designated **Exhibit "N"**.

56. Notwithstanding the impropriety of the repayment demand, DFS and DCC deposited interest payments on the Ogden Notes in a DFS savings account for the benefit of Ogden.

57. The repayment demand included a demand for payment of additional notes claimed by Ogden to be in the total amount of $400,000.00 and dated March 3, 2013 and March 26, 2013 ("Additional Notes"), copies of which are attached hereto and designated **Exhibits "O" and "P"**.

58. Ogden was not authorized to execute the Additional Notes on behalf of DFS.

7

59. The repayment demand of Ogden was inconsistent with the established practice of DFS and the requirements of the Loan Agreement and the Intercreditor and Subordination Agreement with Keystone to make payments of interest only on the PMP Notes and Ogden Note when adequate funds were available and after payment to Keystone as agent for the lenders and only then in the ratio of 90% towards the PMP Notes and 10% towards the Ogden Note.

60. On or about December 11, 2013 Ogden sued DFS and DCC seeking to collect the Ogden Note and Additional Notes. A copy of the Complaint is attached hereto and designated **Exhibit "Q"**.

**Count I**
**PMP against DFS and Brandon Ogden Breach Of MCAF Investment Agreement**
**Material Misstatement**

61. Plaintiffs incorporate by reference the averments contained in paragraphs 1 through 60 herein as if fully set forth at length, verbatim.

62. Pursuant to Section 4.5 of the MCAF Investment Agreement, Ogden and DFS represented and warranted that "[t]he statements and information furnished by or on behalf of the Company . . . and the other documents provided in connection herewith do not, to the knowledge of the Company after due inquiry, contain any untrue statements of a material fact or omit a material fact necessary to make the material statements contained herein or therein not misleading . . .".

63. Between June of 2011 and November of 2012, Ogden individually and as manager of DFS continually and systematically provided PMP with false and untrue statements of material facts and/or omitted material facts about the value of vehicles being financed, the creditworthiness of consumers seeking loans from DFS, and the financial condition of MCA and DFS.

64. Ogden and MCAF made aforesaid untrue statements to PMP in order to obtain additional investments and loans from PMP.

65. As a result of the untrue statements, Ogden and DFS secured over 40 separate investments and loans from PMP over the course of two years totaling more than $9,700,000.00.

66. The foregoing conduct of Ogden constitutes a breach of Section 4.5 of the MCAF Investment Agreement.

67. As a result of the breach by Ogden, PMP has suffered substantial direct, consequential and incidental damages.

### Count II
### PMP against DFS and Brandon Ogden Breach Of MCAF Investment Agreement Indemnification

68. Plaintiffs incorporate by reference the averments contained in paragraphs 1 through 67 as if fully set forth at length, verbatim.

69. Pursuant to Section 5 of the MCAF Investment Agreement, Ogden and DFS agreed to "indemnify, defend and hold harmless PMP . . . from, against and in respect of any and all damages, losses, deficiencies, liabilities, costs and expenses (including reasonable attorneys' fees) resulting from, relating to or arising out of (a) any misrepresentation, omission, breach of representation or warranty or non-fulfillment of any agreement on the part of the Company relating to this Agreement, any agreement entered into in connection herewith, or any statement, schedule, certificate or other document delivered by the Company pursuant hereto . . .".

70. Ogden, MCA and DFS made continuous misrepresentations and omissions as more fully set forth herein in connection with the sale and financing of consumer vehicles and the financial condition of MCA and DFS.

71. As a result of the breach by Ogden and DFS, PMP has suffered substantial direct, consequential and incidental damages.

72. Pursuant to Section 5 of the MCAF Investment Agreement, DFS and Ogden must indemnify PMP for all losses relating to the misrepresentation and omissions.

### Count III
### PMP Against MCA, DFS and Brandon Ogden Securities Fraud

73. Plaintiffs incorporate by reference the averments contained in paragraphs 1 through 72 as if fully set forth at length, verbatim.

74. The aforementioned conduct of Ogden and DFS violates applicable state securities fraud provisions since Ogden and DFS engaged in a device, scheme or artifice to defraud PMP.

75. Ogden and DFS made untrue statements of material facts and omitted stating materials facts which operated as a fraud and deceit on PMP.

76. PMP reasonably relied on the false and material misleading statements and omissions of Ogden and DFS.

77. As a result of the reliance by PMP on the false and material misleading statements and omissions of Ogden and DFS, PMP has suffered substantial direct, consequential and incidental damages.

**Count IV**
**PMP and FLOORiT against Brandon Ogden Breach of Fiduciary Duty**

78. Plaintiff incorporates by reference the averments contained in paragraphs 1 through 77 as if fully set forth at length, verbatim.

79. Ogden owes fiduciary duties to the shareholders and members of MCA and DFS, including PMP and DCC.

80. At all times mentioned herein Ogden was an officer, director and/or manager of MCA and DFS.

81. Ogden breached his fiduciary duties by misrepresenting the value of vehicles purchased by MCA, misrepresenting the creditworthiness of borrowers and misrepresenting the financial condition of MCA and DFS.

82. Ogden breached his fiduciary duties to FLOORiT, the wholly-owned subsidiary of PMP, by misrepresenting the creditworthiness of borrowers and misrepresenting the financial condition of MCA and DFS.

83. As a result of the breach by Ogden, PMP and FLOORiT have suffered substantial direct, consequential and incidental damages.

**Count V**
**FLOORiT against MCA, Ogden and Taylor Ogden Breach of FLOORiT Agreement**

84. Plaintiff incorporates by reference the averments contained in paragraphs 1 through 83 as if fully set forth at length, verbatim.

85. MCA breached the Flooring Agreement with FLOORiT by failing to pay all sums due and owed to FLOORiT, falsifying title information on vehicles financed, destroying data and

collateral, misdirecting or concealing funds and other such actions in violation of FLOORiT's rights under the Flooring Agreement.

86. Taylor Ogden personally guaranteed the obligations of MCA pursuant to the terms of the FLOORiT Agreement.

87. As a result of the breach by MCA, FLOORiT has suffered substantial direct, consequential and incidental damages.

## Count VI
## Declaratory Judgment as to All Parties

88. Plaintiffs incorporate by reference the averments contained in paragraph 1 through 87 as if fully set forth at length, verbatim.

89. PMP seeks a declaration that the Additional Notes signed by Ogden as both "Borrower" and "Lender" are unenforceable because Ogden lacked the authority to execute the Additional Notes on behalf of DFS.

90. PMP seeks a declaration that the demand of Ogden against DCC is improper and inoperative.

91. PMP seeks a declaration that the Ogden Notes are not due and owing because there has been no default in the payment of interest.

92. DCC seeks a declaration that the Transferred Notes are not due and owning because they do not mature until August 1, 2018.

93. There is an actual controversy between the parties.

94. These matters are ripe for adjudication.

95. This is the appropriate forum to resolve this dispute as all parties impacted by the requested declaration are parties to this action.

## Count VII
## PMP and FLOORiT against Ogden and MCA Accounting

96. Plaintiffs incorporate by reference the averments contained in paragraph 1 through 95 as if fully set forth at length, verbatim.

97. Ogden's misconduct described herein was specifically designed to divert the funds of PMP and FLOORiT to MCA for Ogden's own personal interest and benefit.

98. Plaintiffs request that the court require MCA and Ogden to provide a full and complete accounting of all funds taken from DFS or FLOORiT and all expenditures of MCA during 2011, 2012 and 2013 and to present accurate financial statements of MCA as of December 31, 2013.

WHEREFORE, Plaintiffs, Preferred Management Partners, Inc. and FLOORiT Financial Services LLC and DRIVEiT Consumer Credit, LLC demand of defendants Brandon Ogden, Taylor Ogden and My Car Agent:

(a) compensatory damages;

(b) attorneys' fees;

(c) costs;

(d) punitive damages;

(e) declaratory relief;

(f) equitable relief;

(g) accounting relief; and

(h) such other relief as the Court deems just, necessary and proper.

RESPECTFULLY SUBMITTED this 15th day of January, 2014.

McDONALD CARANO WILSON LLP

By: */s/ Jeff Silvestri*
JEFF SILVESTRI, ESQ. (#5779)
2300 W. Sahara Avenue, Suite 1200
Las Vegas, NV  89102
Telephone:  702.873.4100
Facsimile:   702.873.9966
E-mail:  jsilvestri@mcdonaldcarano.com

ROBERT B. BODZIN, ESQ. (*pro hac vice to be submitted*)
KLEINBARD BELL & BRECKER LLP
One Liberty Place, 46th Floor
1650 Market Street
Philadelphia, PA  19103
Telephone:  215.568.2000
E-mail:  rbodzin@kleinbard.com

JOHN FRAZIER HUNT, ESQ. *(pro hac vice to be submitted)*
HUNT & AYRES
1818 Market Street, 33rd Floor
Philadelphia, PA  19103
Telephone:  215.557.8500
E-mail:  jfhunt@huntandayres.com

*Attorneys for Plaintiffs Preferred Management Partners, Inc., FLOORiT Financial LLC, and DRIVEiT Consumer Credit, LLC*

LVDOCS-#295877-v1

13